IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 21-00003-01-CR-W-RK |
| | ) |
| WAYNE A. TRIPP, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION TO**
**DENY DEFENDANT'S MOTION TO SUPPRESS**

Before the Court is Defendant's Motion to Suppress Evidence. Defendant moves the Court to suppress all evidence seized from the vehicle he was driving on May 14, 2020. For the following reasons, Defendant's motion should be denied.

## I. INTRODUCTION

On January 5, 2021, an Indictment was returned charging Defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On April 7, 2022, Defendant filed a motion to suppress. (Doc. 82) The Government responded on May 20, 2022, (Doc. 89) and Defendant replied on May 23, 2022 (Doc. 91). An evidentiary hearing was held on June 28, 2022, with all parties and counsel appearing in person. The Government appeared by Assistant United States Attorneys Maureen Brackett and David Barnes. Defendant was present, represented by appointed counsel Laine Cardarella and Lesley Smith. The Government called Kansas City, Missouri Police Department Sergeant Terrence Owens;[1] Kansas

---

[1] Terrence Owens was the director of corporate security for Shamrock Trading Corporation when he testified at the suppression hearing. (Tr. at 8) On the date of the search at issue, however, he was a sergeant with the Kansas City, Missouri Police Department. (Tr. at 8) He will, therefore, be referred to as "Sergeant Owens" in this Report and

1

City, Missouri Police Department Captain Daniel Graves; Kansas City, Missouri Police Department Officer Christopher Lear; and Kansas City, Missouri Police Department Officer Terry Grimmett[2] to testify. The following exhibits were admitted into evidence:

| | |
|---|---|
| Government's Exhibit 1: | Dash Camera 5210 @ 20200514121650 (TRIP_MD_004) – Officer Sticken's Patrol Vehicle; |
| Government's Exhibit 2: | Dash Camera 5379 @ 20200514123342 (TRIP_MD_004) – Sergeant Owens' Patrol Vehicle; |
| Government's Exhibit 3: | Dash Camera 5652 @ 20200514125504 (TRIP_MD_004) – Patrol Wagon One; |
| Government's Exhibit 4: | Dash Camera 5652 @ 20200514125505 (TRIP_MD_004) – Patrol Wagon Two; |
| Government's Exhibit 5: | Dash Camera 50019 @ 20200514121804 (TRIP_MD_004) – Officer Scott's Patrol Vehicle; |
| Government's Exhibit 6: | Kansas City, Missouri Police Department – Radio traffic relating to May 14, 2020, arrest of Defendant Wayne A. Tripp; |
| Government's Exhibit 7: | Electronic Recording of Exhibit 6; |
| Government's Exhibit 8: | Written CAD Logs relating to May 14, 2020, arrest of Defendant Wayne A. Tripp; |
| Government's Exhibit 9: | Still frame photograph of Defendant Wayne A. Tripp's vehicle from Dash Camera Video 5379 @ 20200514123342 (TRIP_MD_004) – Sergeant Owens' Patrol Vehicle; |
| Government's Exhibit 10: | Still frame photograph of Defendant Wayne A. Tripp's vehicle from Dash Camera Video 50019 @ 20200514121804 (TRIP_MD_004) – Officer Scott's Patrol Vehicle; |
| Government's Exhibit 11: | Still frame photograph of Defendant Wayne A. Tripp's vehicle from Dash Camera Video 5379 @ 20200514123342 (TRIP_MD_004) – Sergeant Owens' Patrol Vehicle; |
| Government's Exhibit 12: | Kansas City, Missouri Police Department – Authorization to Tow Report (TRIP_00021); |
| Government's Exhibit 13: | Kansas City, Missouri Police Department Procedural Instruction – Towing/Protective Custody of Vehicles and Contents (TRIP_ 00817-00836); |
| Government's Exhibit 14: | Kansas City, Missouri Police Department *Miranda* Warnings and Waiver signed by Defendant Wayne A. Tripp (TRIP_00025); |

---

Recommendation.

[2] Terry Grimmett held the rank of sergeant with the Kansas City, Missouri Police Department when he testified at the suppression hearing. (Tr. at 168) Because he was an officer on the date of the search at issue, he will be referred to as "Officer Grimmett" in this Report and Recommendation.

2

| | |
|---|---|
| Government's Exhibit 15: | Kansas City, Missouri Police Department Consent to Search for Buccal Swab – signed by Defendant Wayne A. Tripp (TRIP_00022); |
| Government's Exhibit 16: | Supplemental Kansas City, Missouri Police Report – Officer Christopher Lear (TRIP_00008); |
| Government's Exhibit 17: | Report of Jason Decker (5/14/20); |
| Defendant's Exhibit 4: | Dash Camera 5210 @ 20200514123342 Time stamp 12:39:09 – 12:39:21; |
| Defendant's Exhibit 5: | Dash Camera 5210 @ 20200514121650 Time stamp 12:44:38 – 12:44:46; |
| Defendant's Exhibit 7: | Dash Camera 5210 @ 2020051412165 Time stamp 12:46:06 – 12:46:42; |
| Defendant's Exhibit 8: | Dash Camera 5210 @ 20200514121650 Time stamp 12:46:46 – 12:46:56; |
| Defendant's Exhibit 9: | Dash Camera 5379 @ 20200514123342 Time stamp 12:36:50 – 12:37:15; |
| Defendant's Exhibit 10: | Dash Camera 50019 @ 20200514121804 Time stamp 12:44:42 – 12:46:22; |
| Defendant's Exhibit 12: | Dash Camera 50019 @ 20200514121804 Time stamp 12:48:05 – 12:49:36; |
| Defendant's Exhibit 13: | CAD Air Audio; and |
| Defendant's Exhibit 14: | Dash Camera 5379 @ 20200514123342 Time stamp 12:42:42 – 12:43:03. |

The Court took judicial notice of the City of Kansas City, Missouri Code of Ordinance § 50-164, Disorderly Conduct. (Tr. at 182)

## II. **FINDINGS OF FACT**

On the basis of the evidence presented at the suppression hearing, the undersigned submits the following proposed findings of fact:

1. On May 14, 2020, Kanas City, Missouri Police Department Captain Daniel Graves was driving northbound on Prospect Avenue. (Tr. at 56-57, 76)

2. The area of 35th - 36th Streets and Prospect Avenue in Kansas City, Missouri, is a heavily traveled bus and pedestrian route. (Tr. at 11-12, 130) There is a gas station on the corner. (Tr. at 11, 130) Sergeant Owens described it as a "very, very high crime" area. (Tr. at 12) Captain Graves agreed, stating 35th and Prospect "probably

ha[d] more police service than any other intersection in the city because of the crime rate." (Tr. at 71) Officer Lear similarly described the area as "a very violent area for crime," with "stolen, car-jacked vehicles, [and] robberies." (Tr. at 131) Officer Grimmett testified the area was a "known violent crime and high drug-trafficking area." (Tr. at 176)

3. At approximately 12:32 p.m., Captain Graves observed, from across southbound traffic, a crowd of six to eight individuals in the area of 3632 Prospect, standing by a car on the west side of Prospect Avenue. (Tr. at 58, 98)

4. Captain Graves saw Defendant strike an individual, later determined to be Larry Rivers, who was pinned against a red Honda. (Tr. at 58, 59, 62, 98) Captain Graves thought Defendant had an object in his right hand as he was striking Mr. Rivers in the face. (Tr. at 58, 60; Def. Exh. 13) Captain Graves testified he was 99% sure that the object in Defendant's hand was a handgun. (Tr. at 60, 98-99)

5. Captain Graves witnessed this incident while driving by; he had not been called to the scene by an individual requesting help. (Tr. at 100-101) Captain Graves testified, however, that he was not going to just drive by an individual striking another in the face in public. (Tr. at 120)

6. Captain Graves radioed dispatch that he had witnessed a disturbance involving six to eight men. (Tr. at 39; Def. Exh. 13) He advised that he needed another car, "Code 1," and told dispatch to hold the air. (Tr. at 22, 24, 60, 129, 170; Gvt. Exh. 8) "Code 1" indicates an emergency response where other officers come quickly with lights and sirens activated. (Tr. at 61) The directive to "hold the air" reserved the air for Captain Graves to communicate in case the situation were to escalate. (Tr. at 61) Such a directive indicates a high volatility situation or one involving a high probability of violence or an officer safety issue. (Tr. at 13-14)

7. Mr. Rivers got into the red Honda he had been pinned against and began traveling southbound on Prospect. (Tr. at 62-63) Defendant got into a red Jaguar and began traveling northbound on Prospect. (Tr. at 62, 63) The other individuals at the scene dispersed. (Tr. at 62)

8. Captain Graves shared a description of the red Honda that Mr. Rivers was driving

4

and requested the vehicle be stopped. (Tr. at 61, 62, 63; Gvt. Exh. 13)

9. Captain Graves then made a U-turn on Prospect to get behind the red Jaguar Defendant was driving northbound so that he could perform a traffic stop based upon the observed assault. (Tr. at 64, 66, 101) Although Captain Graves was in an unmarked car, the car still had lights which he activated to initiate the stop. (Tr. at 64)

10. Defendant stopped his vehicle in the middle of the street, in the single northbound lane on Prospect, just in front of the crosswalk. (Tr. at 64, 90, 150, 175; Gvt. Exh. 9)

11. Captain Graves and Officer Grimmett testified that if other vehicles were also traveling northbound on Prospect, they would have to do so in a turning lane or cross over into the southbound lane due to the location where Defendant's vehicle stopped. (Tr. at 64-65, 175) In fact, a bus was later observed to travel into the southbound lane of traffic to get around Defendant's vehicle. (Tr. at 31-32)

12. An ADA bus stop was located to the right of the location where Defendant stopped his vehicle. (Tr. at 17) This type of stop allows buses to pull straight up to the curb so that passengers can step onto a bus without having to step down off the curb or walk into the street. (Tr. at 79, 136; Gvt. Exh. 5 at 12:45:40)

13. Captain Graves testified that he tried to direct Defendant out of the intersection to a gas station on the left, but Defendant rolled up the vehicle's window and sat inside until the second police car arrived. (Tr. at 64-65, 124) Captain Graves observed Defendant moving around inside his vehicle. (Tr. at 65, 124)

14. Once Kansas City, Missouri Police Department Officers Terry Grimmett and Christopher Lear arrived in the second police vehicle, Captain Graves directed Defendant out of his vehicle. (Tr. at 65-66) Defendant complied and was taken into custody. (Tr. at 66)

15. At approximately 12:35 p.m., Captain Graves cleared the air. (Tr. at 24, 66, 76; Gvt. Exh. 1 at 12:35:46)

16. Captain Graves testified Defendant did not have any injuries, or blood on his hands or face. (Tr. at 67, 101) Defendant was well dressed and wore pressed clothes. (Tr.

5

at 67)

17. Captain Graves testified that when he asked Defendant about the incident, Defendant told him that an individual approached him to get a cigarette. (Tr. at 82-83) Defendant was cooperative throughout his interaction with Captain Graves. (Tr. at 102, 119)

18. Kansas City, Missouri Police Department Sergeant Terrance Owens responded to Captain Graves' earlier request to stop Mr. Rivers. (Tr. at 11, 13, 63)

19. When Sergeant Owens arrived in the area of 35th and Prospect, Defendant's red Jaguar SUV was on Prospect facing north. (Tr. at 15-16)

20. Sergeant Owens did not stop where Defendant's vehicle was parked, but continued on to the area of 36th and Prospect. (Tr. at 17-18, 33)

21. Sergeant Owens stopped the red Honda and directed Mr. Rivers out of the vehicle. (Tr. at 17-19)

22. When Sergeant Owens approached Mr. Rivers, Mr. Rivers had blood dripping down his face. (Tr. at 19, 20, 23) There was also blood on Mr. Rivers' shirt and all over his front side. (Tr. at 20) Sergeant Owens testified the injury appeared fresh. (Tr. at 20) Sergeant Owens put on gloves for his protection. (Tr. at 23, 47)

23. When asked what had happened, Mr. Rivers initially denied having been involved in the incident. (Tr. at 35; Def. Exh. 9) He then said that the blood was the result of he and his "bro" fist fighting, but that everything was okay and that there was no problem. (Tr. at 36-37; Def. Exh. 9 at 12:36:55-12:37:14)

24. Mr. Rivers declined medical assistance. (Tr. at 38, 47)

25. While on the scene, none of the individuals watching from their porches approached Sergeant Owens with information or asked for help. (Tr. at 42)

26. Sergeant Owens communicated with Captain Graves by radio to inquire what Defendant had told Captain Graves. (Tr. at 23) Captain Graves responded that Defendant explained there had been a fight over a cigarette. (Tr. at 25, 38, 41; Def. Exh. 13) Captain Graves also told Sergeant Owens he believed Defendant had a gun. (Tr. at 25-26)

27. Soon thereafter, Captain Graves left the scene where Defendant's vehicle was

6

stopped and went to the location where Mr. Rivers was stopped in order to continue investigation of what had happened. (Tr. at 29, 72, 83-84, 102; Gvt. Exh. 1 at 12:42:35) Officers Grimmett and Lear remained with Defendant. (Tr. at 72-73, 131)

28. Captain Graves also observed Mr. Rivers to have a laceration over his left eyebrow and fresh blood splatter and spots on the front of his left pant leg. (Tr. at 84-85)

29. Captain Graves testified Mr. Rivers appeared impaired and that Mr. Rivers played down the incident by stating he and Defendant were just fist fighting. (Tr. at 85-86, 103) Mr. Rivers again declined medical assistance. (Tr. at 103)

30. Captain Graves asked Mr. Rivers if Defendant had a weapon. (Tr. at 108; Def. Exh. 14 at 12:42:46) Mr. Rivers replied, "no." (Tr. at 108; Def. Exh. 14 at 12:42:50) When Captain Graves asked, "What was in his hand?", Mr. Rivers said nothing, that they were just fist fighting. (Tr. at 108-109)

31. None of the individuals outside on their porches or driveways offered any information to Captain Graves about the incident that had occurred between Defendant and Mr. Rivers. (Tr. at 104)

32. While still with Mr. Rivers, Captain Graves radioed Officers Grimmett and Lear at approximately 12:44 p.m., "See if [Defendant will] let you check that car." (Tr. at 72-73, 86, 105, 155; Gvt. Exh. 1 at 12:44:44; Def. Exh. 5 at 12:44:41)

33. Captain Graves, Officer Lear and Officer Grimmett all testified that officers often ask for consent to search while in the midst of an investigation for the sake of efficiency and to involve the individual(s) being investigated in the process. (Tr. at 87, 139, 175-176)

34. Officer Lear asked Defendant for consent to search the vehicle to disprove what had happened. (Def. Exh. 10 at 12:44:45) Defendant refused. (Def. Exh. 10 at 12:44:51)

35. Officer Lear informed Defendant he was being investigated for aggravated assault. (Tr. at 135) He stated that unless officers could disprove the allegations, Defendant would probably have to go to the station to talk with a detective and potentially be arrested. (Tr. at 135, 155-156; Gvt. Exh. 5 at 12:44:55; Def. Exh. 10 at 12:44:55) He further stated if officers searched the car and did not find a weapon, Defendant

7

would be "good to go." (Tr. at 156; Def. Exh. 10 at 12:45:06)

36. Defendant again refused consent. (Tr. at 86-87, 105, 155; Def. Exh. 10 at 12:45:08) In response, Officer Lear stated "All right, cool," and conveyed the refusal to Captain Graves. (Tr. at 135, 137; Gvt. Exh. 5 at 12:45:13; Def. Exh. 10 at 12:45:10)

37. Defendant asked if he could close the sunroof on his vehicle. (Tr. at 157; Def. Exh. 10 at 12:45:41) Officer Lear responded that would be done when the car was towed. (Tr. at 157; Def. Exh. 10 at 12:44:43) Officer Lear explained to Defendant that he was probably going to jail and his car would be towed. (Tr. at 155, 157-158; Gvt. Exh. 5 at 12:44:56; Def. Exh. 10 at 12:45:50) Officer Lear stated officers were trying to help Defendant, but that Defendant was being stubborn. (Def. Exh. 10 at 12:45:59) Officer Lear told Defendant he wanted to look in the car to see if what he said happened could have happened. (Tr. at 158; Def. Exh. 10 at 12:46:05)

38. Mr. Rivers stated he did not want to press charges against Defendant. (Tr. at 109; Def. Exh. 7 at 12:46:09)

39. Based upon his observations of the altercation, the blood on Mr. Rivers, and from speaking with Defendant and Mr. Rivers, Captain Graves determined that Defendant was the aggressor of a violent crime and Mr. Rivers was an uncooperative victim. (Tr. at 88, 120) Captain Graves testified that Defendant had violated the law and he needed to take him off of the street. (Tr. at 120)

40. As a result, Captain Graves directed Officers Grimmett and Lear to arrest Defendant for disorderly conduct and to tow his vehicle. (Tr. at 29-30, 75, 88-89, 137-138, 159; Def. Exh. 8 at 12:46:49)

41. Sergeant Owens testified that if an individual is arrested for disorderly conduct, they are taken into custody. (Tr. at 30) If a vehicle is involved, the vehicle will be towed if it is impeding traffic or in an area where it could be damaged. (Tr. at 30) Sergeant Owens testified that he always indicated when training other law enforcement officers that vehicles were to be towed out of necessity, not as punishment. (Tr. at 31)

42. Officers testified that the vehicle Defendant was driving could not be left at the scene because it was blocking the intersection and lanes of traffic in a high-traffic area,

8

and interfered with the bus stop. (Tr. at 31-32, 46-47, 89, 91, 136; Gvt. Exh. 5 at 12:45:38; Gvt. Exh. 9) Additionally, it was a very nice vehicle – a 2020 Jaguar – in a high-crime area. (Tr. at 91, 176-177) Defendant was the sole occupant and the Jaguar was a rental. (Tr. at 91-92)

43. Sergeant Owens testified that while he was at 36th and Prospect, he never observed any cars being backed up because of delays at 35th Street caused by Defendant's vehicle. (Tr. at 42)

44. Captain Graves is familiar with Kansas City, Missouri Police Department's Procedural Instruction 17-13, which governs the towing/protective custody of vehicles and contents. (Tr. at 92-93; Gvt. Exh. 13) He testified that the purpose of this instruction is to document items left inside vehicles. (Tr. at 93) Any items recovered from the vehicle would be documented on the offense report. (Tr. at 94)

45. Section A(2) of the Towing Requirements and Procedures (Annex A) provides that "[t]he decision to tow a vehicle will never be made to penalize the owner/operator." (Gvt. Exh. 13; Tr. at 113)

46. Section B(1)(a) of the Towing Requirements and Procedures permits officers to tow an abandoned vehicle from public policy when, *inter alia*, the vehicle directly interferes with the maintenance of, care of, or the emergency use of streets by any department of the city. (Tr. at 94, 113-114; Gvt. Exh. 13) Captain Graves initially testified this section permitted Defendant's vehicle to be towed since it interfered with the operation of the city bus. (Tr. at 94-95, 114)

47. The Towing Policy defines "abandoned property/vehicle" to mean "[a]ny unattended motor vehicle . . . removed or subject to removal from public or private property whether or not operational." (Gvt. Exh. 13; Tr. at 114) Captain Graves later clarified that he did not consider the vehicle Defendant was driving to be "abandoned" as defined by the policy. (Tr. at 115)

48. Section E of the Towing Requirements and Procedures allows officers to tow a vehicle when the operator is placed under custodial arrest. (Gvt. Exh. 13). The policy further states that in such instance, officers "will allow the operator . . . time to arrange for the vehicle's timely removal" unless: (a) the operator's physical

9

condition, active resistance, or disorderly conduct prevents such an arrangement; (b) the operator eludes arrest; or (c) the vehicle will be placed on an investigative hold. (Gvt. Exh. 13)

49. Procedural Instruction 17-13 defines "timely removal" as a "[r]easonable amount of time a member has to allow the arrestee or person responsible for the vehicle to arrange for the removal of the vehicle. Members must use discretion under the circumstances (e.g., whether the arrestee is cooperating with the members, the members have waited for more than thirty (30) minutes, call volume, etc.))." (Gvt. Exh. 13)

50. Captain Graves did not recall if Defendant ever offered to have anyone pick up the Jaguar. (Tr. at 95)

51. Captain Graves testified that his general practice was – if asked – to allow someone to pick up a vehicle for an arrested individual, as long as that person arrived before the tow truck. (Tr. at 95, 115-116)

52. Captain Graves further testified that the three exceptions which allow officers not to allow an arrestee time to arrange for the vehicle's timely removal did not apply in this case. (Tr. at 117-119)

53. Officer Lear did not ask Defendant if he would like to have someone come get his vehicle. (Tr. at 115, 164-165) He further testified that Defendant did not ask for permission to have somebody come pick up his vehicle. (Tr. at 140) Officer Lear did not recall Defendant otherwise identifying another individual who could come to the scene to drive the Jaguar away. (Tr. at 151)

54. Mr. Rivers was not arrested or issued a citation since Captain Graves did not see him fighting back or observe him striking Defendant. (Tr. at 34, 52, 89) Because Mr. Rivers was not arrested and his vehicle was not impeding traffic, his vehicle was not towed. (Tr. at 32, 89)

55. Before searching and towing Defendant's vehicle, Officer Lear filled out a Form 36 P.D. (Tr. at 151-152) In doing so, he checked the box on the form which indicated the vehicle was being towed because of an arrest; the box indicating the vehicle was being towed because it had been abandoned was not checked. (Tr. at 161; Gvt. Exh.

12) The form also referenced tow number "051146." (Gvt. Exh. 12)

56. Officer Lear then performed an inventory search of the Jaguar. (Tr. at 96, 152) A loaded firearm, controlled substances and three cell phones were recovered. (Tr. at 96; Gvt. Exh. 16)

57. Officer Lear listed the firearm, controlled substances, and cell phones in his progressive investigation report rather than on the Authorization to Tow form because they were recovered as evidence, not left in the vehicle. (See Tr. at 142-150, 163-164; Gvt. Exh. 12; Gvt Exh. 16) The progressive investigation report also listed tow number "051146" so that it could be matched to the Form 36 P.D. (Tr. at 15; Gvt. Exh. 16)

58. While the Jaguar was being inventoried, Defendant asked if officers would make a phone call for him and requested access to his phones. (Tr. at 116; Gvt. Exh. 5 at 12:50:11-12:52:17) Defendant stated he wanted his phones because that was where numbers were stored. (Gvt. Exh. 5 at 1:00:11-1:00:43)

59. Defendant's request was denied because the phones were contraband. (Tr. at 116) When Defendant asked why his vehicle was being searched, officers explained that searches are conducted in all instances where a vehicle is towed to protect the Police Department from liability for missing items. (Gvt. Exh. 5 at 12:50:271-12:51:18)

## III. DISCUSSION

Defendant challenges his May 14, 2020, arrest and the resulting search of his vehicle. (Tr. at 193) He argues that the tow and the search were not conducted pursuant to the Kansas City, Missouri Police Department's standardized policy. Defendant, therefore, seeks suppression of the items recovered from his vehicle as well as the statement he made to law enforcement as fruit of the poisonous tree. The Government maintains that Defendant's arrest and the inventory search of his vehicle were lawful.

11

## A. ARREST

"A police officer may, consistent with the Fourth Amendment, arrest someone without a warrant if the officer has probable cause to believe the person has committed a crime." *United States v. Flores-Lagonas*, 993 F.3d 550, 560 (8th Cir. 2021) (quoting *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014)). "This is so even '[i]f [the] officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence." *Id*. (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). "Probable cause exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Id*. (quoting *Peterson*, 754 F.3d at 598). Probable cause for a warrantless arrest does not require absolute certainty. *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). "In making a probable cause determination, '[l]aw enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances.'" *Id*. (quoting *United States v. Henderson,* 613 F.3d 1177, 1181 (8th Cir. 2010)).

Defendant argues that his arrest in this case was unlawful. The Court disagrees. Kansas City, Missouri Ordinance § 50-164(1) prohibits disorderly conduct, which is defined as the use of "offensive, disorderly, threatening, abusive or insulting language, conduct or behavior." Here, Captain Graves observed Defendant striking Mr. Rivers in the face while Mr. Rivers was pinned against a car. (Fact No. 4) Captain Graves believed Defendant had an object in the hand he was using to strike Mr. Rivers, and testified he was 99% sure such object was a handgun.[3] (Fact No. 4)

---

[3]The Court notes that even if Defendant did not have a gun in his hand, the act of striking Mr. Rivers in the face was still unlawful as § 50-164(1) merely prohibits, *inter alia*, threatening or abusive conduct.

When Captain Graves stopped Defendant and directed him out of the Jaguar, he observed Defendant to be free from injury. (Fact No. 16) By contrast, Mr. Rivers had a laceration over his left eyebrow and fresh blood dripping down his face. (Fact Nos. 22, 28) When questioned, Mr. Rivers downplayed the incident. (Fact Nos. 29, 30) Captain Graves determined Defendant was the aggressor and Mr. Rivers to be an uncooperative victim. (Fact No. 39) Captain Graves testified that, because Defendant had violated the law, he was placed under arrest. (Fact. No. 39) This arrest was constitutionally permissible.

### B. INVENTORY SEARCH

Defendant next argues that the towing and the inventory search of his vehicle were not conducted pursuant to the Kansas City, Missouri Police Department's standardized policy. Defendant's argument is two-fold. He first argues that officers should have allowed him the opportunity to arrange for his vehicle's timely removal. Defendant also argues that a detailed accounting of property found within his vehicle was not completed as required. Defendant contends these failures demonstrate that the inventory search was pretext for police to instead search for evidence of criminal activity. The Government maintains that the tow and the inventory search complied with the Police Department's standard policy but that, even if they did not, such actions were not a ruse to conduct an investigatory search.

A search by law enforcement must be conducted pursuant to a warrant in order to be "reasonable" under the Fourth Amendment unless one of the "few specifically established and well-delineated exceptions" to the warrant requirement exists. *United States v. Marshall*, 986 F.2d 1171, 1173 (8th Cir. 1993) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)); *see also* U.S. CONST. amend. IV. One such exception is an inventory search. *Id*. at 1173-74. *See also United*

13

*States v. Kennedy*, 427 F.3d 1136, 1143 (8th Cir. 2005) ("Police may conduct a warrantless search of a lawfully-impounded vehicle even in the absence of probable cause."). When the driver of a car is arrested, police may impound the vehicle and conduct an inventory search. *United States v. Stephens*, 350 F.3d 778 (8th Cir. 2003). "The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." *United States v. Hall*, 497 F.3d 846, 851 (8th Cir. 2007) (quoting *Kennedy*, 427 F.3d at 1143).

"Inventory searches that are 'conducted according to standardized police procedures' are reasonable." *Id*. (quoting *Kennedy*, 427 F.3d at 1143). *See also United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011). "The requirement that officers follow standard procedure in conducting inventory searches does not foreclose the use of some discretion by officers 'so long as that discretion is exercised according to standard criteria and on the basis or something other than suspicion of evidence of criminal activity.'" *Hall*, 497 F.3d at 851 (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987) (holding warrantless inventory search valid if it is conducted pursuant to standardized police procedures and not done in bad faith or for the sole purpose of investigation)). The presence of an investigative motive "does not invalidate an otherwise valid inventory search." *United States v. Arrocha*, 713 F.3d 1159, 1164 (8th Cir. 2013) (quoting *United States v. Garner*, 181 F.3d 988, 991 (8th Cir. 1999)). *See also United States v. Harris*, 795 F.3d 820, 822 (8th Cir. 2015) (quoting *United States v. Pappas*, 452 F.3d 767, 771 (8th Cir. 2006) ("The police are not precluded from conducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity."); *Marshall*, 986 F.2d at 1174-75; *United States v. Porter*, 859 F.2d 83, 85 (8th Cir. 1988) ("[A]n officer's suspicion that evidence may be present does not invalidate an otherwise lawful inventory search.").

14

Even when inventory searches are not conducted according to standardized procedures, however, suppression of the recovered evidence is not mandated. *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003). *See also United States v. Morris*, 915 F.3d 552, 557 (8th Cir. 2019). "Compliance with procedures merely tends to ensure the intrusion is limited to carrying out the government's caretaking function." *Rowland*, 341 F.3d at 780 (quoting *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998)). "There must be something else; something to suggest the police raised 'the inventory-search banner in an after-the-fact attempt to justify' a simple investigatory search for incriminating evidence." *Id*. (quoting *Marshall*, 986 F.2d at 1175). Here, that "something else" is lacking.

At the outset, the Court finds that although the Government argues that the provision of the Kansas City, Missouri Police Department's requirements and procedures regarding abandoned vehicles (Section B) also applies here, such argument is not supported by the evidence of record or the Court's reading of the policy. The towing policy defines an abandoned vehicle to mean "[a]ny unattended motor vehicle . . . removed or subject to removal from public or private property whether or not operational." Defendant's vehicle was not abandoned; he was merely removed from the vehicle as a result of the stop. Captain Graves likewise testified at the suppression hearing that he did not consider the vehicle Defendant was driving to be "abandoned" as defined by the policy. (Fact No. 47)

Instead, Section E, governing the custodial arrest of the driver, is the towing provision applicable to the facts presented here. This provision allows officers to tow a vehicle and provides, in relevant part:

15

> When a vehicle is stopped on private or public property and the operator (arrestee) is placed under custodial arrest, the members will allow the operator (arrestee) time to arrange for the vehicle's timely removal unless:
> - a. The arrestee's physical condition, active resistance, or disorderly conduct prevents such an arrangement; or
> - b. The person operating the vehicle eludes arrest for an alleged offense for which the member would have taken the operator into custody (RSMo 304.155); or
> - c. The vehicle will be placed on an "Investigative Hold." Refer to Annex C of this written directive for further information regarding "investigative holds."[4]

While this provision requires officers to allow an arrestee time to arrange for the vehicle's timely removal, it does not require officers to affirmatively ask arrestees if they would like someone to pick up their vehicle. Additionally, "[n]othing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory." *Morris*, 915 F.3d at 556 (quoting *United States v. Agofsky*, 20 F.3d 866, 873 (8th Cir. 1994)). *See also Arrocha*, 713 F.3d at 1164.

Here, Captain Graves determined that Defendant was the aggressor of a violent crime and Mr. Rivers was an uncooperative victim. (Fact No. 39) When an individual is arrested for disorderly conduct, they are taken into custody and the vehicle is towed if it is impeding traffic or in an area where it could be damaged. (Fact No. 41) Officers testified that Defendant's vehicle could not be left at the scene since it was blocking the intersection and lanes of traffic, interfered with the bus stop, and because it was a nice vehicle in a high-crime area. (Fact No. 42) These are valid reasons to tow Defendant's vehicle. *See United States v. Williams*, 777 F.3d 1013, 1016 (8th Cir. 2015) (holding that officer's decision to tow vehicle so it would not remain on the street in a "high crime" neighborhood was a legitimate reason to tow). Officers did seek consent to search

---

[4] Although the provision contains three exceptions, none of the exceptions apply here. (*See* Fact Nos. 48, 52)

the vehicle, but it was routine practice to do so. (Fact No. 33) Although Officer Lear referenced Defendant would be "good to go" and encouraged him to help disprove what had happened, such statements do not invalidate the otherwise valid inventory search. Officer Lear did not make the decision to arrest Defendant. Captain Graves – the officer who directed Defendant's arrest – testified that Defendant violated the law and needed to be taken off of the street. (Fact No. 39) Defendant was arrested for disorderly conduct and such arrest was not dependent on whether a gun was located in the vehicle.

Defendant argues that he was not given an opportunity to make arrangements to have his vehicle removed as described in Section E, the provision governing the custodial arrest of the driver. Contrary to Defendant's assertion, Annex A of the Towing Requirements and Procedures (which contains the provision governing custodial arrest of the driver in Section E), was not skipped; instead, the time allowance provision does not operate in the manner Defendant urges. Section E does not require officers to ask if the custodial defendant wants to have someone remove the vehicle. Moreover, even if Defendant's interpretation of the language were adopted, the Jaguar was a rental and the record is devoid of anyone available and authorized to drive it. To be sure, Captain Graves testified that his general practice is to allow someone to pick up a vehicle for an arrested individual, as long as that person arrived before the tow truck. Such discretion is afforded by Kansas City, Missouri Police Department's policy. (*Se*e Fact No. 49) Defendant was the sole occupant of the Jaguar. (Fact No. 42) The evidence of record does not indicate Defendant identified anyone to remove his vehicle from the scene, asked for someone to do so, or that any such individual could have done so under the vehicle's rental agreement. (*See* Fact No. 53) Defendant only asked to make a call and for access to his phones after his vehicle was being inventoried. (Fact No. 58)

17

Even then, Defendant did not indicate his requests were for the purpose of arranging for someone to remove his vehicle from the scene. (*See* Fact No. 58)

Defendant also argues that the contents of the vehicle were not properly documented, thereby demonstrating the search was investigatory in nature. Before Defendant's vehicle was towed, Officer Lear performed an inventory search. (Fact No. 56) The Kansas City, Missouri Police Department's policy states that when a vehicle is towed pursuant to a custodial arrest, officers will complete a Form 36 P.D. Officer Lear did so in this case, but did not list items found in Defendant's vehicle on the Form 36 P.D.; instead, the recovered items were listed in detail on Officer Lear's progressive investigation report. (Fact Nos. 55, 57) Officer Lear testified he did so because the firearm, controlled substances and cell phones were recovered as evidence, not left in the vehicle. (Fact No. 57) The progressive investigation report and Form 36 P.D. both listed tow number "051146" so that the forms could be matched. (Fact Nos. 55, 57) These actions are consistent with the Police Department's caretaking function of searching vehicles to properly document anything of value left in the vehicle, and do not suggest that the inventory was merely a pretext for an investigatory search. *Cf. United States v. Taylor*, 636 F.3d 461, 465 (8th Cir. 2011) (wherein officer testified she "would not have arrested [the defendant], impounded his vehicle, or inventoried the contents of the truck if not for her belief that the vehicle contained evidence of a narcotics crime"). The search of Defendant's vehicle was thus valid under the inventory search exception to the Fourth Amendment's warrant requirement.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and

18

Case 4:21-cr-00003-RK    Document 102    Filed 09/09/22    Page 18 of 19

the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this Report and Recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the Report and Recommendation which are accepted or adopted by the District Judge except upon the ground of plain error or manifest injustice.

/s/ *Jill A. Morris*
JILL A. MORRIS
UNITED STATES MAGISTRATE JUDGE